IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| UNITED STATES OF AMERICA, | ) | CR 11-30-M-DWM |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | ORDER |
| JOHN ROBERT MULINKSI, | ) | |
| Defendant. | ) | |

December 5 through December 9, 2011, Defendant John Robert Mulinski was tried for eight counts of wire fraud. At the close of the government's case, he moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The Court took the motion under advisement. Mulinski renewed the motion at the end of trial, and the Court again reserved its ruling. After the jury found Mulinski guilty of Counts I, II, and VI and acquitted him of the remaining counts, the Court directed the parties to submit briefs concerning the Rule 29

motion.

For the reasons discussed below, the Court holds that there was sufficient evidence to support Mulinski's convictions on Counts I, II, and VI.

## I. Statement of Facts

This case stems from Mulinksi's business activities in this state. At the time of the charged conduct, he was a roofing contractor who had recently started advertising and working in Montana. The three counts of wire fraud he was convicted of involved contracts with two separate clients, Max Jackson and Adrianne Van Alstine. Other counts involved additional clients and still more clients testified for the government at trial.

## A. Counts I and II

Max Jackson signed a roofing contract with Mulinski for $19,116.00 on November 17, 2010, and work began shortly thereafter. Mulinski hired Richard Hickman and three of his associates to start removing siding from the house to check for water damage. Extensive mold and rot was visible in photos admitted as exhibits, and an insurance adjustor testified that significant repair was necessary.

Jackson entered another contract with Mulinski for $18,590.00 on November 23, 2010, and a third on December 1, 2010. The three contracts totaled $47,104.00. Mulinski was paid a total of $38,575.00, including five payments

from Jackson and two from his insurance company. Counts I and II concern checks signed by Jackson on November 23, 2010 as partial payments (for $7,025.00 and $8,614.00, respectively) on the first two contracts.

Jackson testified that sometime between December 1 and December 16, 2010, he and his insurance company adjustor read stories on the internet that made them distrust Mulinski. They decided to stop paying him, although they did not inform him of this decision. December 15 and 16, Mulinski sent Jackson's insurance adjustor emails indicating what needed to be completed on the three contracts and stating that the issue of his payment needed to be resolved.

Work slowed or stopped on Jackson's roof and siding. At trial, Mulinski claimed the reason was that Jackson had not paid him what he was owed. However, the government points to evidence in the record that undermines this claim. This evidence is discussed in the analysis below.

**B. Count VI**

Van Alstine also hired Mulinski to replace the roofs on her house, guest house, and garage. Mulinski did not work on the garage and was not paid for any work associated with the garage. The total contracted work on the main house and guest house totaled just under $50,000.00. Van Alstine paid Mulinski $39,888.00 in six checks, five of which were admitted as exhibits. Count VI concerns a check

3

for $8,994.00 that was dated January 13, 2011. Mulinski's employees continued to work on the project until approximately January 21, 2011.

Van Alstine testifed that initially, Mulinski was reliable, work started right away, and there were workers on site almost every day. Work was completed satisfactorily on the main house, with the exception of the skylight, which Mulinski ordered but did not install.

Problems began with the guest house. At some point, Mulinski stopped working on the guest house altogether, though one of his employees, Ken Towers, testified that almost all the work had been completed and it was ready to be shingled.

Mulinski claimed at trial that he stopped working before completing the contracts because he had been fired, that Van Alstine received nearly $10,000 more in goods and services than she paid him, and that all the work he charged her for was necessary. On the other hand, other testimony indicated Mulinski told the Montana Attorney General that he owed the Van Alstines $10,125.00 and that not all the work on the house was necessary. Additionally, Van Alstine testified Mulinski promised to give her a refund but never did, that Mulinski never told her that she owed him more money, and that Mulinski told her he sold his business to Quality Construction in Missoula but provided the name of someone who Van

4

Alstine knew did not own Quality Construction.

**C. Other evidence**

The jury heard extensive additional testimony relevant to whether Counts I, II, and VI were part of a "scheme" to defraud customers and whether Mulinski had the requisite intent to commit wire fraud. Three witnesses (Parker, Markuson, and Schwenk) testified that Mulinski accepted payments from them to perform roofing work, but never performed any work or refunded their money. Another customer, that customer's tenant, and the contractor hired to replace Mulinski testified that Mulinski misrepresented the amount of material that he had replaced on the customer's house. Other customers stated Mulinski failed to finish projects he had started for them. In some of these cases, work may have stopped because Mulinski's employees walked off the job believing, incorrectly, that Mulinski did not have workers' compensation insurance.

Evidence also suggested Mulinski was unreliable in other ways. Several witnesses testified Mulinski represented himself as part of a larger company than was true. Advertising salespeople testified Mulinski had purchased advertising but failed to pay for it, despite repeated oral and written promises he would do so. There was conflicting evidence about the number of employees Mulinski had at any time, whether he paid them correctly, whether he used an alias, whether the

addresses he provided for his business were legitimate, and whether his advertisements were truthful.

## II. Analysis

Upon the defendant's motion, a court may set aside a jury verdict and enter an acquittal. Fed. R. Crim. P. 29. However, the court must "view[] the evidence as a whole and in the light most favorable to the government, and draw[] all reasonable inferences therefrom in the government's favor." United States v. Mejia, 559 F.3d 1113, 1118–19 (9th Cir. 2009). The court may not weigh conflicting evidence nor determine the credibility of witnesses; that is the jury's exclusive purview. United States v. Shelton, 588 F.2d 1242 (9th Cir. 1978)(citations omitted). "The evidence is sufficient to support a conviction if, 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Milwitt, 475 F.3d 1150, 1154 (9th Cir. 2007) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979))(emphasis in original).

"The elements of wire fraud are: (1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) specific intent to defraud." United States v. Pelisamen, 641 F.3d 399, 409 (9th Cir. 2011) (citation omitted); 18 U.S.C. § 1343.

Here, the parties stipulated that Mulinski used wire communications. In dispute is whether a rational juror could find, beyond a reasonable doubt, a scheme to defraud, that the specific wire communications alleged in the remaining counts were in furtherance of that scheme, and that Mulinski intended to defraud Jackson and Van Alstine.

A "scheme to defraud" includes "'any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises.'" United States v. Treadwell, 593 F.3d 990, 996 (9th Cir. 2010)(quoting Carpenter v. United States, 484 U.S. 19, 27 (1987)). The words "to defraud" have the "common understanding" of "wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." Carpenter, 484 U.S. at 27 (internal quotation marks and citation omitted). A jury may find a scheme to defraud based solely on circumstantial evidence and the inferences drawn from it. See Ngo v. Giurbino, 651 F.3d 1112, 1114–15 (9th Cir. 2011)(citations omitted).

Intent to defraud may also be established by circumstantial evidence. Pelisamen, 641 F.3d at 409 (quoting United States v. Rogers, 32 F.3d 1226, 1230 (9th Cir. 2003). Intent to defraud may be inferred from a defendant's misrepresentations or omissions. Sullivan, 522 F.3d at 974; United States v.

7

Jenkins, 633 F.3d 788, 804 (9th Cir. 2011)("misrepresentations and omissions are sufficient from which to infer intent to defraud")(citation omitted); Neder v. United States, 527 U.S. 1, 21–22 (1999)(Congress intended the wire fraud statute to incorporate the common law, "well-settled meaning of 'fraud' [which] required a misrepresentation or concealment of material fact"). Intent to defraud may also be inferred from "a pattern of conduct or a series of acts aptly designated as badges of fraud." United States v. Lothian, 976 F.2d 1257, 1267 (9th Cir. 1992)(quoting United States v. Krohn, 573 F.2d 1382, 1386 (10th Cir. 1978) cert. denied, 436 U.S. 949 (1978)).

A good-faith intent to repay or restore property that was fraudulently obtained from a victim is no defense. Treadwell, 593 F.3d at 996–97. Moreover, a victim does not have to suffer pecuniary loss. Id. at 996 (citing United States v. Oren, 893 F.2d 1057, 1061 (9th Cir. 1990)). In United States v. Oren, the defendant falsely represented to a real estate appraiser that he had another offer on land he hoped the National Park Service would purchase. 893 F.2d at 1060. To increase the appraisal value, he drafted and provided the appraiser a letter from the fictional offeror, which the appraiser mentioned in his final appraisal and provided to the Park Service. Id. Because the defendant intentionally made a false statement to effect the sale, the Ninth Circuit held it was irrelevant both whether

the land was actually worth the appraised value and whether the defendant genuinely believed that it was. Id. at 1062–63.

> The intent to induce one's victim to give up his or her property on the basis of an intentional misrepresentation causes "harm" by depriving the victim of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not the victim will suffer the permanent loss of money or property.

Treadwell, 593 F.3d at 997 (citation omitted).

Drawing all inferences in favor of the government, there is sufficient circumstantial evidence for a rational juror to conclude beyond a reasonable doubt that Mulinski is guilty of Counts I, II, and VI.

The timing of the counts Mulinski was convicted of is significant. The jury acquitted Mulinski of the three wire fraud counts involving checks negotiated before November 2010.[1] Testimony indicated that sometime in October 2010, Mulinski's employees walked off at least some of his jobs because one employee had received and shared incorrect information from the State that Mulinski did not have workers' compensation coverage. The simultaneous loss of employees at multiple work sites could give rise to a reasonable doubt that Mulinski intended to defraud these customers.

---

[1] Count III involved Van Alstine's first check, cashed September 27, 2010. Count VII involved the Domroses' payment, cashed October 21, 2010. Count VIII involved the Nortons' payment, cashed October 8, 2010.

However, a rational juror could also conclude beyond a reasonable doubt that Mulinski had a scheme and intent to defraud later customers. Mulinski started new projects, including the Jackson roof,[2] soon after losing multiple employees. At that time, he had several other contracts that remained unfinished (e.g. with the Domroses, the Nortons, Van Alstine, and Hot Springs School). He failed to inform new customers of these facts and continued to represent to at least some customers that he was part of a large company with multiple crews.

At trial, Mulinski claimed he stopped or slowed work on the Jackson roof because Jackson had stopped paying him, but other evidence contradicted this claim. On December 16, 2010, Mulinski provided Jackson a schedule of completion, promising to complete phases of the project by specific dates. Mulinski also promised to finish the roof at no cost to Jackson. The next day, he told Jackson he would carry the financial burden if necessary to complete the work on the house. December 23, Mulinski again promised to complete the work, stating that weather had gotten in the way. On December 27, he claimed he put the "original crew" back on Jackson's house. Despite these promises, no more work was done.

Jackson also testified he repeatedly requested that Mulinski bring supplies

---

[2] Jackson's first contract with Mulinski was signed November 17, 2010.

and materials to the house to show that progress was being made, but no materials were delivered. Hickman testified that most of the work that was done consisted of removing materials from Jackson's house, and that Hickman, not Mulinski, paid for any materials that they put back on the house. Finally, Mulinski told Jackson that a man who worked on the project, "Joey," was one of his best employees. However, Joey had never worked for Mulinski before he was hired for the Jackson project. The facts Mulinski omitted and misrepresented were material to Jackson's ability to assess Mulinski's capacity to follow through on contractual promises. Mulinski thus "depriv[ed Jackson] of the opportunity to weigh the true benefits and risks of the transaction." Treadwell, 593 F.3d at 997 (citation omitted).

Furthermore, even if Jackson received the value of services he paid for, which is disputed, he did not receive what he expected. His roof was not completed, and his home remained open to the elements for much longer than Mulinski told him it would be. The costs also continued to ratchet upward. Soon after Mulinski cashed the checks that are the subject of Counts I and II, he stopped or slowed work on Jackson's house. Viewing all this evidence together, a rational juror could conclude beyond a reasonable doubt that Mulinski had a scheme and specific intent to defraud Jackson and that the checks were in furtherance of this

11

scheme.

Similarly, a rational juror could conclude that even if Mulinski initially did not have intend to defraud Van Alstine, he developed that intent later on. Mulinski apparently continued to work on Van Alstine's roofs after his employees walked off other projects, and Van Alstine continued making payments even as his estimates of the costs increased. Mulinski was acquitted of wire fraud on Count III, which involved a $2,512.00 check cashed September 27, 2010, Count IV, which involved a $7,000.00 check cashed December 29, 2010, and Count V, which involved a $17,700 check cashed January 6, 2011. However, the jury convicted him of wire fraud involving the last check from Van Alstine, a $8,994.00 check that was cashed on January 13, 2011.

Much of the evidence presented at trial was inconsistent with Mulinski's claim that Van Alstine owed him money and fired him from the project. Van Alstine testified that when she became suspicious of Mulinski because of rumors or internet stories, she asked Mulinski to refund some of her money so she could act as general contractor on the project. She said he promised he would get her a check. However, he never refunded her any money. He also told her that he had sold his business to a larger company, a statement she knew was untrue. Later, Mulinski told the Attorney General's office that he owed Van Alstine over

$10,000 and that some of the work he had charged her for was unnecessary. In contrast, at trial he testified that she owed him that amount and that all the work had been necessary.

Viewing all the evidence as a whole, in the light most favorable to the government, a rational juror could conclude beyond a reasonable doubt that by January 13, 2011, Mulinski's intent regarding the Van Alstine project had changed and he now meant to extract money from her without finishing the project. Mejia, 559 F.3d at 1118–19. Indeed, Mulinski never finished the guest house or started work on the garage. Van Alstine claimed that when she requested a refund, he stopped working on the project and eventually stopped returning his calls. This occurred shortly after he cashed the check that is the basis of Count VI. Thus, a rational juror could find that the check was cashed in furtherance of the scheme to defraud.

Other circumstantial evidence also supports the jury's verdict. Mulinski engaged in "a pattern of conduct or a series of acts" that a rational juror could "aptly designate[] as badges of fraud." Lothian, 976 F.2d at 1267 (quoting Krohn, 573 F.2d at 1386). Advertising salespeople testified he purchased but failed to pay for numerous advertisements, always promising that he would send a check or talk to his secretary or accountant, but never doing so. Evidence also suggested

Mulinski charged customers for more materials or different materials than what he delivered. Multiple customers testified they had hired and paid Mulinski, but that he either never showed up to do the work or never completed what he had been paid for. He would return their calls or emails for a while, but then would disappear. Witnesses also testified Mulinski went by various names (e.g. John Roberts, John Robert, John R., John Mulinski) and provided customers invalid business addresses. He misdirected a customer who was seeking a refund to contact an attorney who had only represented him on a narrow issue in the past.

Finally, one could conclude that Mulinski's advertisements and representations at least "overreach[ed]," Carpenter, 484 U.S. at 27. He suggested he was from Montana, that he had been in business here for decades, and that his company was larger than it was. A rational juror could accept the Government's contention that these statements were misrepresentations designed to lure in customers, "depriving [them] of the opportunity to weigh the true benefits and risks of the transaction, regardless of whether or not [they] suffer[ed] the permanent loss of money or property." Treadwell, 593 F.3d at 997 (citation omitted).

## V. Conclusion

It is no defense that Mulinski meant to repay Jackson and Van Alstine at

some later point, or complete the work for which he had been hired. Treadwell, 593 F.3d at 996–97. Nor is it any defense if the value of the work Mulinski completed equaled the value he received. Id. at 996 (citing United States v. Oren, 893 F.2d 1057, 1061 (9th Cir. 1990)). A rational juror could conclude beyond a reasonable doubt that Mulinski intentionally engaged in a scheme to defraud Jackson and Van Alstine based on his misrepresentations, omissions, "overreaching," and pattern of conduct.

Accordingly, IT IS HEREBY ORDERED that Mulinski's motion (dkt # 56) is DENIED. The Court will not set aside the jury verdict.

Dated this 6th day of March 2012.

*signature*

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT